## GENERAL RY. SIGNAL CO. v. GREAT NORTHERN RY. CO.

District Court, D. Minnesota, Third Division. September 19, 1927.

No. 811.

Patents ⊙⟿328—Howe patent, No. 1,551,515, for automatic train control, held not infringed.

Howe patent, No. 1,551,515, for system of automatic train control *held* not infringed.

In Equity. Suit by the General Railway Signal Company against the Great Northern Railway Company. Decree of dismissal.

Paul, Paul & Moore, of Minneapolis, Minn., and Clifton V. Edwards and Lawrence K. Sager, both of New York City, and Neil D. Preston, of Rochester, N. Y., for plaintiff.

Thomas Ewing and Frank C. Cole, both of New York City, Thomas Balmer, of Seattle, Wash., and Fletcher Rockwood, of St. Paul, Minn., for defendant.

JOHN B. SANBORN, District Judge. The bill of complaint charges infringement of Howe patent, No. 1,551,515, and the answer sets up the defenses of lack of invention and noninfringement.

The plaintiff complains of the installation of an automatic train-control system by the defendant, made by the Sprague Safety Control & Signal Corporation; that company has indemnified the railroad against loss by virtue of any patent litigation and has assumed the defense of this suit. While the railroad company has a real interest in the matter, the main contest is between rival manufacturers of automatic train-control devices.

The subject-matter of the patent in suit relates to automatic train control, the general object of which is to require the engineer to observe wayside signals, and, in case he fails in such observations, to stop his train. Train control generally has been under investigation and development by various inventors for a great many years. Most railroad accidents are caused by the failure of the human element, rather than the failure of any of the mechanical equipment, and it has been the hope of various men to produce some automatic control system which would, so far as possible, eliminate the danger caused by carelessness, without seriously interfering with the operation of the road.

The block signal system has generally been adopted by the railroads throughout the country. Under this system, the trackway is divided into block sections, which are ordinarily a mile apart. At the entrance to each block is a signal. When a train is in one block, the signal directly behind it is set at danger. When the train reaches the next block, the signal at that block is set at danger, and the signal in the block behind becomes a caution signal, and the signal in the block behind that, which was previously a caution, goes to the clear position. Therefore, behind every train there will be, first, a danger signal at the entrance to the block in which the train is; at the entrance to the block behind that, a caution signal, and at the entrance to the block behind the caution signal, a clear signal. The purpose of these signals is obvious. An engineer, upon seeing a caution signal, knows that at the entrance to the next block he will, in all probability, meet with a danger signal, indicating that a train is in that block. If, before he reaches the danger signal, the train ahead of him has passed out of the block, he will meet with another caution signal, which will advise him of that situation and enable him at all times to keep his train under such control as to avert an accident. The principal function of a railroad is to carry traffic with all possible speed consistent with safety. The purpose of the block signal system is to keep the engineer so advised that he can proceed without stopping unless that becomes necessary. The stopping of a train means expense and delay, and unnecessary stops must be avoided.

The block signal system is electrically operated upon a normally closed track circuit. The system depends upon electrical energy to give a clear signal, and any failure of it results in the danger signal. The wheels of a train, or anything else which short circuits the battery, create a danger signal.

There was no difficulty in providing an inductor in the trackway to be operated in connection with a block signal system, so that, when the signal went to danger, the trackway inductor would give an impulse to an engine-carried inductor which might be used to produce an automatic stop. Such a system has been used on the New York subways. That system was not satisfactory to the railroads, because it required, in every instance, that, if an engineer or motorman passed a danger signal which failed to clear up as he reached it, he would have an automatic stop. It is not always necessary to require an engineer to bring his train to an absolute stop at a danger signal. The purpose of a signal is to advise him of the situation so that he may bring his train under such

control that it can make a stop when necessary. The safe operation of the train past a danger signal would, of course, depend upon conditions. The thing which was most desired by the railroads was to secure some system which would not take the train out of the control of the engineer unless that became absolutely necessary. Some of the systems proposed to solve the problem by putting it in the power of the engineer, by operating a device, to put the automatic train-control apparatus out of commission, so that he might rely upon it or not, as he saw fit. These devices have been referred to as annulling devices.

A system causing an automatic stop upon passing a danger signal had the disadvantage that it took the train away from the engineer at a time when that might not be justified. The disadvantage of the system with the annulling device was that the engineer could put it out of operation at a time when he was vigilant, but might fail to put it into operation, and there might be an accident at another block because of his lack of vigilance.

The idea of the patent in suit, in a general way, was to provide a plan to avoid the disadvantages referred to, which would permit the engineer to retain control of his train so long as he was alert and was observing signals, and which would automatically take it away from him if he failed to be alert. To accomplish this, Howe provided an electrical apparatus which, if the block signal was at danger or caution, would result in the stopping of any train coming into the block unless the engineer, within a limited time before the danger or caution signal was reached, threw over a hold-off lever and held it over until he had passed the signal. If he failed to "hold off," his train would automatically be stopped, or, if he held off for more than the time limit, there would be an automatic brake application. Howe's theory was that, to prevent an automatic stop, an engineer must be alert and forestall, and that any failure on his part to observe signals would result in the train being in effect taken away from him. For failing to hold off, he was penalized by the stopping of his train, and, in order to release his brakes, he was required to dismount from the cab and operate a resetting device.

It is claimed that what Howe did was to disclose or describe a practical and efficient means or apparatus intended to carry out a new plan of train control, and that the new means or apparatus constitute the subject-matter of the claims in suit.

Howe locates at the entrance of each block an inductive device governed by a circuit, which, when open, puts the inductor in condition to transmit an impulse to stop a train. The circuit is open when the block signal system is at either danger or caution. The car or engine to be stopped carries an inductor, which passes in very close proximity to the trackway device. The car-carried inductor is normally energized by a battery and made into an electro magnet. If, at the time the inductor on the car or engine passes over the trackway inductor, the trackway circuit is open, there is an impulse of current created. This current impulse has the effect of creating a current in the electrical apparatus on the engine, causing an automatic application of the brakes. If the trackway circuit, however, is closed, then the engine-carried inductor would pass over the trackway inductor without receiving any impulse, and there would be no automatic application of the brakes. The circuit being open, there will be an automatic brake application unless the engineer is operating his hold-off device, which does not result in preventing the impulse from the trackway, but operates a shunt circuit, which prevents the de-energization of the electrical means, the de-energization of which by the track impulse sets the brakes.

I shall not attempt to set out in detail an exact descripion of the apparatus set forth in the Howe patent, which is shown by the various diagrams which have been introduced in evidence. It is sufficient to say that the apparatus works upon the normally closed circuit principle, so that any disarrangement of it results in stopping the train. The application of the brakes takes place through the movement by the apparatus of the engineer's brake valve to a service position. After the train is stopped, the engineer must dismount and reset before he can proceed. The engineer has fifteen seconds in which to hold off. If he fails to release his lever after that time, a service application of the brakes takes place automatically.

Claims 9 and 57 give a good idea of Howe's apparatus:

"9. In an automatic train control system, the combination with car-carried brake control apparatus co-operating with the air brakes of the car to produce an automatic brake application, of means for automatically initiating the operation of said apparatus from the trackway under unfavorable traffic conditions; a hold-off device conveniently accessible for operation by the engineer and effective only if operated prior to the initia-

tion of operation of said apparatus, for preventing such operation in spite of its control from the trackway, said hold-off device if kept in the hold-off condition longer than a predetermined limited time after each operation thereof acting automatically to actuate said apparatus and cause a brake application, whereby the engineer may prevent an automatic brake application only if he anticipates the operation of the brake control apparatus by a manual operation of the hold-off device and restores the hold-off device to normal within a limited time."

"57. In an automatic train control system of the intermittent inductive type, a normally energized electroresponsive device on the train co-operating when de-energized with the airbrake equipment to produce a brake application, said device having stick contacts opened when it operates, a track element having a magnetic core and a governing circuit and assuming its active condition unless said governing circuit is closed, impulse receiving means on the train including a normally closed circuit controller inductively influenced through an intervening air gap by said track element in its active condition and opening said circuit controller temporarily during movement of the train by the track element, acknowledging means conveniently operable by the engineer and including normally open contacts quickly closed upon operation thereof and normally closed contacts opened after a limited time while the acknowledging means is in its operated condition, a normally closed energizing circuit for said electroresponsive device including in series said stick contacts, circuit controller and normally closed contacts of the acknowledging means, a shunt circuit for said circuit controller closed by the normally open contacts of the acknowledging means, and a reset switch not accessible to the engineer while at his post for closing a shunt circuit around said stick contacts and thereby permit re-energization of the electroresponsive device after operation thereof, said reset switch if kept in its operated position preventing release of the brakes."

The plaintiff, in its commercial installation, does not in all respects follow the Howe patent, but it does follow its principle. It has installed automatic train-control apparatus, between 1921 and the present time, upon upwards of 6,000 miles of railroad and 2,000 locomotives.

The Interstate Commerce Commission, in an original report on automatic train-control devices (69 Interst. Com. Com'n R. 258), prescribed and adopted specifications and requirements for the installation of automatic train-stop or train-control devices, and required a number of railroads to install such devices upon their lines, such installations to be completed by January 1, 1925. A further order was made on January 14, 1924, requiring additional installations by the same roads and other roads. In its first requirements, the Commission did not permit the use of a forestalling or acknowledging means whereby the engineer might hold off an automatic brake application in going past a danger signal, but, by an order of July 18, 1924, in the Matter of Automatic Train-Control Devices, 91 Interst. Com. Com'n R. 426, it reviewed its former action and modified paragraph 1 of its first order to read as follows:

"1. Automatic train stop:

"(a) Without manual control by the engineman, requiring the train to be stopped; after which the apparatus may be restored to normal condition manually and the train permitted to proceed; or

"(b) Under control of the engineman, who may, if alert, forestall the application of the brakes by the automatic train-stop device and control his train in the usual manner in accordance with hand signals or under limits fixed by train order or prescribed by the operating rules of the company."

This modification was made on request of the railroads. The report shows that they considered that automatic train-control devices were still in an experimental stage, that they objected to the requirement that all trains should automatically be stopped when a danger signal was passed, and the Commission finally concluded to permit the engineer, if alert, to forestall.

The defendant, Great Northern Railway Company, was required by the Commission to make certain installations of automatic train-control apparatus upon certain sections of its line. It adopted the installation of the Sprague Safety Control & Signal Corporation as being the least objectionable from an operating standpoint. The plaintiff's device uses a track inductor, which extends beyond the top of the rail and is placed outside of the rail. It will transmit an impulse to the car-carried inductor, provided that the inductors pass in very close proximity to each other. The line of the Great Northern where the installation was to be made is a single track line, and, in order to use the plaintiff's device, it would be necessary to have an inductor upon each side of the track at the en-

trance to each block. The defendant's system has a trackway inductor placed between the rails, which is lower than the rails, and which will transmit an impulse to the inductor on the engine through a space much greater than will the plaintiff's device. While the defendant's apparatus does not cause a service application of brakes by moving the engineer's brake valve to service position, it does bring the train to a stop in substantially the same way, through the bleeding of the train pipe, and requires resetting in the same way. The plaintiff's expert claims that the defendant's apparatus is almost a Chinese copy of the plaintiff's commercial installation and of the structure shown in the patent, while the defendant's expert testifies that there are substantial differences. The result accomplished is, of course, substantially the same. Both are automatic train-control systems of the intermittent, inductive type.

My opinion is that the Great Northern installation is not a copy of the device described by Howe in his patent; that there are substantial differences. The defendant claims that it did not follow Howe, but that it followed the teachings of the Sprague British patent, and that Howe also follows the Sprague British patent, and many of his ideas were identical with those of Sprague. There is much in common between the patents.

The art was crowded at the time that Howe entered it. There was nothing new in the idea of transmitting an impulse from the track to the engine, no new principles were involved in connection with the bringing about of the brake application through the electrical equipment operating upon the engineer's brake valve, and there was nothing new in the idea of the shunt circuit to permit forestalling. Howe used a combination of old and well-known means to accomplish his purpose. Barberie proposed to do mechanically almost the identical thing which Howe proposed to do electrically, and the British patent to Lydall shows an apparatus very similar in principle to Howe, which had in connection with it an acknowledging or forestalling device which could be held over only for a limited time without causing the blowing of a whistle. It is claimed by the plaintiff that the blowing of the whistle would not be the same as the brake application. It was Lydall's idea that it was a sufficient penalty, for failure to release the manually operated forestalling apparatus, to cause the blowing of the whistle. The whistle was blown by air taken from the brake pipe. An enlargement of the vent through which the air passed into the whistle would have released enough air to cause a brake application. Certainly to remove Lydall's whistle and to enlarge the outlet so as to cause a brake application would not constitute invention. This was apparently the exact position taken by Howe when his application came into interference with that of Bulla in the Patent Office, and this position was sustained by the Law Examiner and the interference dissolved.

It has been said that most of the patents which have been introduced in evidence as illustrating the prior art are mere paper patents and do not represent practical or useful devices. That may be true to some extent, but my understanding is that the railroads have constantly resisted the installing of devices of this kind, principally because they considered them in the experimental or development stage and because they interfered with the efficient operation of trains. Up to the time the Interstate Commerce Commission had authority to interest itself in the matter of automatic train control, no very great practical development of it had taken place. In view of the state of the art, it seems to me that, if the Howe patent involved invention at all, the claims can receive only a very narrow construction, and that Howe is practically limited to the exact structure described by him. It is said that he produced a new result. The result is substantially the same as that of the Barberie device and other devices illustrative of the prior art. It may differ in degree, but that is all. It is a device to produce an automatic stop, with a means to forestall for a limited time only, and means to restore the apparatus after a brake application.

I do not hold the patent invalid, but I do hold that there was no infringement. The defendant may have a decree of dismissal.